UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| ROBERT MORGAN and LEONARD ANDREW, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:17-CV-474-CHB |
| v. | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| COMMONWEALTH OF KENTUCKY et al., | ) ) ) | |
| Defendants. | ) ) ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on Defendants John Tilley, Aaron Smith, Aaron Jones, and Denny Acosta's Motion for Summary Judgment [R. 72] and Defendant James Erwin's Motion for Summary Judgment [R. 74]. Plaintiffs have responded to the Motions [R. 81], and Defendants have filed briefs in reply [R. 89; R. 95]. Plaintiffs filed a reply [R. 97] to which Defendant Erwin responded [R. 98]. This matter is ripe for review. For the reasons herein, the Motions are **granted in part and denied in part**: Plaintiff Andrew's claims against Defendants Jones, Acosta, and Smith are dismissed without prejudice for failing to exhaust administrative remedies. Plaintiff Andrew's claims against Defendants Tilley and Erwin are dismissed with prejudice. Plaintiff Morgan's claims against Defendant Tilley are dismissed with prejudice. Plaintiff Morgan's supervisory liability claim against Smith is dismissed with prejudice. Because the Court seeks additional argument and authority in light of the Sixth Circuit's recent decision in *Beck v. Hamblen County*, 969 F.3d 592 (6th Cir. 2020) (addressing the proper standard for qualified immunity), the Court will deny without prejudice Defendants' Motions for

Summary Judgment with respect to Plaintiff Morgan's claims against Defendants Erwin, Smith (other than supervisory liability), Acosta, and Jones with leave to refile.

## I.    Background Facts

This case involves two former inmates, Robert Morgan and Leonard Andrew, who were assaulted by other inmates while incarcerated at Kentucky State Reformatory ("KSR") in August and September 2016. [R. 10 pp. 6–7]  Both Plaintiffs claim to have notified KSR staff and Kentucky Department of Corrections ("KDOC") officials that they were afraid for their safety due to the high levels of inmate violence at KSR.  They claim that Defendants' actions, or lack thereof, constitute deliberate indifference under the Eighth Amendment. [R. 10 pp. 7–9]

### A.    Staffing and Reorganization at KSR

Beginning in 2014, KSR had—according to Defendant Warden Aaron Smith—a "significant problem hiring staff." [R. 81-2 p. 28]  KSR had numerous vacancies for corrections officer positions. [R. 81-5 pp. 21–22]  Defendant James Erwin, who was the Deputy Commissioner of KDOC at the time, stated that KSR had a vacancy rate between 25–50%. [*Id.* p. 22]  Because of these vacancies, staff had to work a mandatory 60 hours per week. [R. 81-2 pp. 28–29, 36]  Corrections officers worked 12- and sometimes 16-hour shifts. [R. 81-3 pp. 13–14; R. 81-2 pp. 35–36; R. 81-5 pp. 61–62]  To combat the shortage, KSR brought in other KDOC employees from Eastern Kentucky to ensure that KSR was always fully staffed. [R. 81-2 p. 29]  They also brought in probation and parole staff to work prison security. [R. 81-5 pp. 24–26]  Some administrative staff worked security as well; those who had not already been trained in safety protocols received training. [*Id.* p. 64; R. 81-2 pp. 31–32]

Due to these efforts, no shift at KSR went uncovered. [R. 81-5 p. 25; R. 81-2 p. 36]  However, Warden Smith was concerned that the long hours could affect officers' focus. [R. 81-2

pp. 29–30]  Nevertheless, in January 2016, after completing an audit of the facility and staffing

levels, the American Correctional Association ("ACA") re-accredited KSR for the next three

years. [R. 74-7]  The audit found that KSR complied with 100% of the mandatory standards, and

98.8% of the non-mandatory standards. [*Id.* p. 28]  Later in 2016, KSR underwent a Program

Security Review—a contracted internal audit done once per year for quality-control purposes—

that showed similar results. [R. 81-5 pp. 28–29; R. 74-9]

On July 12, 2016, Warden Smith issued a memorandum regarding a pending

reorganization of KSR. [R. 81-2 p. 32; R. 81-10]  The memo stated:

> As many of you have heard, staffing changes in this region have affected KSR.
> Over the next few months many of the dorms on the yard will be closing and
> transfers of roughly one half of the inmate population out of this institution will
> occur.
>
> Those dorms slated for closure are: 4, 5, 6, 8, 11 and Segregation.
>
> Determination on transfers will be made on a case-by-case basis through Central
> Office Classification staff.
>
> If you have specific questions, please feel free to speak with your Unit Staff.

[R. 81-10]  Warden Smith released the memo because there were rumors and misinformation

spreading among the KSR inmates regarding the reorganization. [R. 81-2 p. 33]  However, the

reorganization of KSR did not happen until 2018. [*Id.* p. 44]  According to Warden Smith, there

was an increase in inmate-on-inmate violence within KSR after the memo. [*Id.* pp. 45–46]  He

attributed this to inmates having an "I don't care" attitude because they thought they were going

to be transferred. [*Id.*]  This also led to inmates collecting any outstanding debts they were owed.

[*Id.* pp. 45–48]  Warden Smith discussed the increased violence with then-Deputy Commissioner

Erwin, and Erwin worked with population management to help separate problem inmates. [*Id.*

pp. 47–48]

### B.   Plaintiff Andrew

Plaintiff Leonard Andrew was attacked by fellow inmate Dustin McKinney on August 6, 2016. [R. 72-5]  Andrew was found lying motionless in a flower garden in the yard. [*Id.*]  Andrew initially told the corrections officer who found him that he had tripped and fallen in the flower bed. [*Id.*]  However, that officer observed that because of the injuries—including a shoe print–shaped bruise on the side of his head—it looked like Andrew had been assaulted. [*Id.*]  Andrew later admitted that he had been assaulted by an unknown inmate. [*Id.* p. 2]  A subsequent investigation determined that inmate McKinney had committed the assault. [*Id.* pp. 2–3]  Andrew suffered serious facial injuries, could not open his eye due to swelling, and required surgery. [R. 81-12; 81-13]

Andrew states that at some point prior to the attack, he told Deputy Warden James Coyne that he was worried about being attacked because of his age, health, and the increased violence at KSR. [R. 81-11 p. 2]  Andrew states that Coyne told him that he would pass his concerns along to Warden Smith. [*Id.*]  He did not tell any of the Defendants directly about his concerns. [*Id.* pp. 1–3]

On August 7, 2016, the day after the assault, Andrew declined an offer for protective custody. [R. 72-7; R. 81-11 p. 6]  He also signed a conflict disclaimer on September 7, 2016, stating that he had no known conflicts with inmate McKinney and there was no reason they could not be housed in the same institution or unit. [R. 72-6; R. 81-11 pp. 5–6]

On August 11, 2016, Andrew filed an administrative grievance relating to his assault. [R. 15-1]  In the "Brief Statement of the Problem" section of the grievance form, Andrew wrote:

> On Saturday 8/6/16 around 7-8 pm I was jumped and assaulted by 4 men. I was taken to the hospital the same night and returned on Sunday afternoon. I asked that the camera footage for that time be reviewed, because only one of the three was taken to SEG [segregation]. As of the below date, I've heard nothing else.

[*Id.*]  The "Action Requested" by Andrew was "[t]hat the camera footage be reviewed and appropriate action be taken." [*Id.*]  Under the KDOC grievance policy, disciplinary procedures are not grievable, because they have their own appeals process. [R. 81-20; R. 81-21 pp. 13–14] Andrew's grievance was interpreted as requesting disciplinary action against another inmate and was rejected as non-grievable. [R. 15-1]  Finally, on August 22, 2016, Andrew wrote a letter to Deputy Warden Coyne inquiring as to why no one had been punished for his assault and detailing various other disciplinary violations other inmates were committing. [R. 81-14]

### C.   Plaintiff Morgan

Plaintiff Robert Morgan also suffered significant injuries in an attack by fellow inmates at KSR.  In May of 2016, Morgan wrote a letter to Governor Matt Bevin and Department of Corrections Commissioner Rodney Ballard regarding the safety conditions at KSR. [R. 81-8]  In the letter, Morgan wrote that stronger inmates were "beating on" younger and weaker inmates, extorting them, and sexually assaulting them. [*Id.* pp. 1, 3]  He stated that inmates were forming gangs and committing serious offenses undeterred. [*Id.* p. 2]  Morgan included that he suffered from mental health issues and had been sexually abused both as a youth and as an adult in prison. [*Id.*]  He further claimed inmates were using and selling drugs, making their own alcohol, and gambling. [*Id.* pp. 1–3]  He also wrote that in the previous few months several inmates had been sent to the hospital because of beatings from other inmates, and that KSR staff did not monitor the security cameras. [*Id.* p. 4]  Finally, he claimed that the prison staff saw what was occurring but did not care, that "it is every man for himself," and that "you have to carry a lock or a shank to protect yourself." [*Id.* pp. 7–8]  On May 26, 2016, Deputy Commissioner James Erwin responded to the letter on behalf of Governor Bevin and Commissioner Ballard, stating that:

> "[a]fter a careful review of the issues referenced in your letter this office has
> contacted staff at KSR and was not able to find any merit to your claims. This

office is aware of the staff shortages and is working diligently to remedy that
situation however the safety and security of the institution has not been
compromised.

[R. 81-9]  Erwin claims he contacted Warden Smith regarding this letter, although Warden Smith

claims that he does not recall any conversations with Erwin regarding Morgan, nor does he recall

investigating any claims raised by Morgan. [R. 81-2 p. 58; R. 81-5 pp. 77–80]

On August 11, 2016, one month after Warden Smith's reorganization memo and five

days after Andrew was attacked, Morgan wrote a second letter to Erwin. [R. 81-15]  In this letter,

Morgan followed up on Erwin's response, complaining that the conditions he had previously

written about were not addressed. [*Id.*]  Morgan referenced three recent inmate attacks at KSR

(including Andrew's), claimed that there were gangs that were "out of control," and noted that

inmates were "packing shanks and locks for protection because it's so out of control." [*Id.* p. 2]

He also noted that violent inmates targeted older inmates and sex offenders, and that inmates

were being extorted for their psych meds. [*Id.* p. 1, 5]

Two days before he was attacked, Morgan met with Warden Smith and told him he was

in danger. [R. 81-16; R. 81-2 p. 53]  Warden Smith knew Morgan better than most inmates and

talked with him frequently. [*Id.* p. 51]  However, Warden Smith does not recall Morgan telling

him that he was afraid for his safety during that meeting. [*Id.* p. 54]

On September 11, 2016, Morgan was attacked.  According to Morgan, he was attacked

because of the debt of another inmate, Timothy Biggs. [R. 72-10 pp. 14–15]  Morgan had

previously told his friends to persuade the inmates to whom Biggs owed money to leave Biggs

alone. [*Id.*]  However, the morning of the assault, Biggs told Morgan "the debt I owe, now, you

owe." [*Id.* p. 15]  Around 2:00 p.m., three or more inmates tried to stab him with a homemade

shank and chased him to his dorm. [R.74-2 p. 27]  This was confirmed by inmate Biggs. [R. 81-

18 p. 5]  Then around 3:00 p.m., three or more attackers attacked Morgan again, this time in front of his wing, kicking and stomping him. [*Id.* pp. 27–28; R. 81-17]  This instance was captured by KSR security footage. [R. 81-18 p. 4]  Morgan then went to his room and claims that two of the attackers tried to open his door, showed him a shank, and told him they would kill him. [*Id.*]  Morgan did not notify any KSR staff that the attacks were occurring. [R. 74-2 p. 45]

Finally, Morgan was attacked for a third time that day just outside his cell in the B wing of his dorm.  This attack was captured by KSR security footage. [R. 72-8]  The video shows inmates Dustin McKinney and Isidro Perez walking toward Morgan, who enters his cell and closes the door. [R. 72-8 at 3:50:00–3:50:50]  McKinney and Perez follow Morgan, and when they are nearly at Morgan's cell, the camera is covered by a white T-shirt or rag for sixteen seconds. [R. 72-8 at 3:50:49–3:51:05; R. 72-9 pp. 1–2 ¶ 5]  When the camera is uncovered McKinney and Perez are walking back away from Morgan's cell. [*Id.*]  McKinney and Perez continue to walk in and out of the hall, looking into Morgan's cell, trying the cell door, and waiting outside the door just out of view. [R. 72-8 at 3:51:32–3:53:43]  Morgan eventually comes out of his cell, armed with a table leg, going in and out of his cell. [*Id.* at 3:56:23–4:00:54]  McKinney and Perez[1] rush Morgan, and McKinney grabs another inmate's walker, using it as a weapon. [*Id.* at 4:00:54]  At 4:01:24 p.m., 30 seconds after McKinney and Perez rushed Morgan and 24 seconds after the first blow was struck, Officer Denny Acosta appears on the video walking toward the fight. [*Id.* at 4:01:24]  At that point Acosta radioed for assistance and medical. [R. 81-3 p. 40; R. 81-9 p. 3 ¶ 10]  At 4:01:41 p.m., 47 seconds after McKinney and Perez rushed Morgan, and 41 seconds after the first blow, Officer Aaron Jones appears on the screen running toward the fight. [R. 72-8 at 4:01:41]  The two officers arrived at

---

[1] A third inmate also appears to throw a punch at Morgan and then immediately flee.

the fight at 4:01:51 p.m. and broke it up with OC spray and verbal commands. [R. 72-9 p. 3]  A

third officer appears on screen at 4:02:19, followed by two more at 4:03:04. [*Id.*]  By 4:04:10,

ten officers had arrived on the scene. [*Id.* pp. 3–4]  Medical officials arrived at 4:09:39. [*Id.* p. 4]

Corrections officers Jones and Acosta were assigned to Morgan's dorm. [R. 72-9 p. 1]  At

the time of Morgan's attack in the B wing of the dorm they were conducting a cell search in the

A wing. [R. 81-3 p. 36]  The A and B wings are essentially one long hallway with a foyer and an

office in the middle of them, so that theoretically with all the cell doors closed and no one

standing in the hallway one could see from one end of the A wing to the end of the B wing. [*Id.*

p. 37]  If inmate cell doors are open, it is impossible to see all the way down the wing. [*Id.* p. 31]

At the time of the attack, Officer Jones stated that he and Acosta could not see what was

happening, but they could hear it. [*Id.* p. 36]  However, the incident report states that Acosta saw

several inmates run into the B wing, at which point Jones advised him to investigate. [R. 81-18 p.

5]

Morgan suffered a concussion, collapsed lung, facial and hand fractures, and was stabbed

multiple times in the attack. [R. 74-2 pp. 25–26; R. 81-19; R. 72-12]  Morgan filed an

administrative grievance regarding the attack. [R. 81-17]  In the grievance, Morgan described the

attack and the injuries he suffered. [*Id.* pp. 3–4]  He then wrote that:

> All this happened while Officer Jones was making rounds upstairs and shaking
> down, down stairs.  If they had enough staff to run this prison and monitor camera
> activity then a lot of this stuff wouldn't happen.  If staff was on their job this
> wouldn't have happened and therefore are accountable for my injuries.  And it's a
> major security concern when an inmate can get his hands on a shank like was
> used on me.  If something aint done someone's going to get killed with the
> increase violence at KSP.

[R. 81-17 pp. 3–4]  This grievance was initially submitted to Casey Dowden, the institutional

grievance coordinator, who thought that the grievance described a grievable issue. [R. 81-21 pp.

19–20]  However, Unit Administrator Everett Thomas ultimately deemed Morgan's grievance non-grievable because he believed that it was related to a disciplinary action. [*Id.* pp. 17–20] Defendants agree that this was an incorrect decision under the inmate grievance procedure. *See* [R. 72-1 p. 14]  Morgan could not appeal the decision. [R. 81-21 p. 23]

### D.    Procedural History

Plaintiffs Andrew and Morgan filed this case on August 7, 2017 [R. 1] and submitted their Amended Complaint on September 6, 2017. [R. 10]  The remaining Defendants are John Tilley, Secretary of the Kentucky Justice & Public Safety Cabinet; James Erwin, Deputy Commissioner of Adult Institutions at KDOC and later acting Commissioner of KDOC; Aaron Smith, Warden of KSR; and Denny Acosta and Aaron Jones, both corrections officers at KSR. [*Id.* ¶¶ 5–7, 11–12]  The Amended Complaint purports to contain five counts.  The first two counts are claims under 42 U.S.C. § 1983 for violations under the Eighth Amendment under a failure-to-protect theory. [*Id.* ¶¶ 42–51]  The third count is also an Eighth Amendment claim against Defendants Tilley, Erwin, and Smith in their supervisory capacity. [*Id.* ¶¶ 52–55]  Count four was a negligence claim under state law [*Id.* ¶¶ 56–60], and count five sought injunctive relief [*Id.* ¶¶ 61–66].

The Court previously granted summary judgment for failure to exhaust administrative remedies for the § 1983 claims in favor of all Defendants except Jones. [R. 20 p. 13]  The Court reasoned that because Officer Jones was the only Defendant named in either of Plaintiffs' administrative grievances, and the KSR internal grievance procedure requires inmates to "identify all individuals," the Plaintiffs had not *properly* exhausted their administrative remedies with respect to all other Defendants. [*Id.* pp. 8–12]

However, upon reconsideration, the Court reinstated the § 1983 claims against all Defendants because it found that Defendants had not shown that administrative remedies were actually "available" to Plaintiffs. [R. 27]  First, the Court found that Defendants had not shown that inmates could actually file grievances against high-ranking state officials such as Tilley and Erwin, and thus found that they had not established that it was an available administrative remedy with respect to those two Defendants. [*Id.* pp. 5–6]  Second, the Court found that there were genuine issues of fact as to whether the grievance process was actually "available" to them given their argument that their grievances were incorrectly deemed non-grievable. [*Id.* pp. 6–8]

The Court also dismissed the negligence claim with respect to all defendants except Defendant Jones. [R. 27 pp. 11–12]  Plaintiffs have been released from KSR, and accordingly their claim for injunctive relief was denied as moot without objection. [R. 48]  Plaintiffs have also dismissed their claims against all Defendants except Tilley, Erwin, Smith, Acosta, and Jones. [R. 67]

## II.    Legal Standards

### A.    Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Lindsay v. Yates,* 578 F.3d 407, 414 (6th Cir. 2009).  The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986).  When, as here, the defendant moves for summary judgment, "[t]he mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.  The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324.  Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248.  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## B.      Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), inmates must exhaust their administrative remedies before bringing claims under § 1983.  Exhaustion is an affirmative defense that must be proven by defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017).  "When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Id.* (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)).  Exhaustion serves two

purposes.  First, exhaustion allows a prison "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the prison's] procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). (internal quotation marks omitted).  Second, exhaustion promotes efficiency because "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and administrative proceedings create a useful record for judicial consideration. *Id.*

Section 1997e(a) of the PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  To properly exhaust administrative remedies, prisoners must "complete the administrative review process in accordance with the applicable rules." *Woodford*, 548 U.S. at 88.  In other words, the prison grievance rules define the boundaries of proper exhaustion, not the PLRA. *Bock*, 549 U.S. at 218; *Mattox*, 851 F.3d at 590–91 (noting inmates must comply with a grievance procedure's requirement that the inmate name each person from whom he seeks relief).  However, "[a]n inmate need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016).  To determine whether a remedy is "available" courts must take into account "the real-world workings of prison grievance systems" and examine whether the remedy, while "officially on the books, is not capable of use to obtain relief." *Id.* at 1859.

On a motion for summary judgment on grounds of failure to exhaust, defendants carry the initial "burden of showing that there was a generally available administrative remedy, and that the prisoner did not exhaust that remedy." *Bennett v. Mich. Dep't of Corr.*, 2017 WL

3208591, at *5 (E.D. Mich. July 24, 2017) (citing *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir.

2014)).  Once the defendant meets that burden the plaintiff must "come forward with evidence

showing that there is something in his [or her] particular case that made the existing and

generally available administrative remedies effectively unavailable to him [or her]." *Id.*; *see also*

*Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th

Cir. 2018); *Brantner v. Freestone Cty. Sheriffs Office*, 776 F. App'x 829, 832 (5th Cir. 2019);

*Wright v. Ga. Dep't of Corr.*, 820 F. App'x 841, 845 (11th Cir. 2020).

### C.   Failure to Protect: Deliberate Indifference Under the Eighth Amendment

To show a constitutional violation under the Eighth Amendment, an inmate must show

that a defendant was deliberately indifferent to his or her safety. *Bishop v. Hackel*, 636 F.3d 757,

766 (6th Cir. 2011).  Deliberate indifference has two prongs, an objective prong and a subjective

one. *Id.*  In failure-to-protect cases, the objective prong requires a plaintiff to show that "he is

incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 833 (1994)).  The subjective prong requires showing that the individual

defendants (1) were "aware of facts from which the inference could be drawn that a substantial

risk of serious harm exist[ed]; (2) actually drew the inference; and (3) consciously disregarded

the risk." *Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017) (internal quotation marks

omitted).  This standard is higher than mere negligence, and most akin to criminal recklessness.

*Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013).  In cases with multiple defendants, courts

must evaluate the subjective prong for each defendant individually. *Garretson v. City of Madison*

*Heights*, 407 F.3d 789, 797 (6th Cir. 2005).  A plaintiff may show a prison official had this

awareness of this risk in "the usual ways, including inference from circumstantial evidence."

*Farmer*, 511 U.S. at 842.

Prison officials can be found deliberately indifferent if they are aware that an inmate belongs to a class of persons who are vulnerable to assault and fail to protect him or her. *Bishop*, 636 F.3d at 767 (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004)).  A prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer* 511 U.S. at 842–43.  However, a plaintiff must show that each officer had enough personal involvement to be subjectively aware of his or her vulnerability. *Bishop*, 636 F.3d at 768; *see also Clark-Murphy v. Foreback*, 439 F.3d 280, 291 (6th Cir. 2006) ("Given the brief exposures of these two defendants to [plaintiff] and given the resulting absence of evidence regarding their purposeful indifference to his health and safety needs, the claims against these defendants must be dismissed as a matter of law."); *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) ("[P]ersonal liability on any of the defendants . . . must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others . . . .").

Finally, a prison official who is unaware of a substantial risk of harm may not be held liable even if the risk was obvious and a reasonable prison official would have noticed it. *Bishop*, 636 F.3d at 767.  Prison officials are also not liable if they responded reasonably to an objectively serious risk, even if the inmate still suffered harm. *Farmer*, 511 U.S. at 844.

### D.     Supervisory Liability

Supervisory officials cannot be held vicariously liable under 42 U.S.C. § 1983 for their subordinates' actions. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691–95 (1978); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[T]he term supervisory liability is a misnomer.

- 14 -

Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").  Instead, supervisory liability requires "active" unconstitutional behavior on the part of the supervisor. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016).  "At minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002).

Supervisory officials may also be held liable if they "abandon the specific duties of [their] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)).  This liability only exists where "some execution of the supervisors' job function results in the plaintiff's injury." *Id.* (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)).  The supervisor must have abdicated their responsibility with the active performance of his or her individual job function that directly resulted in the constitutional injury. *Id.*

### E.  Qualified Immunity

The doctrine of qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A defendant is entitled to qualified immunity on summary judgment unless a reasonable juror, when viewing the facts in the light most favorable to the plaintiff, could find that: (1) the defendant violated a constitutional right; and (2) that right was clearly established. *Bishop*, 636 F.3d at 765 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Anderson v. Creighton*, 483 U.S. 635, 649 (1987).  This requires a plaintiff to "identify

with 'a high degree of specificity' the legal rule that a government official allegedly violated."

*Beck*, 969 F.3d at 599 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).  In

using case law to establish a legal rule, "the fact pattern of the prior case must be 'similar enough

to have given fair and clear warning to officers about what the law requires.'" *Id.* (quoting

*Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019)).

The Supreme Court has made clear that "prison officials have a duty . . . to protect

prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833.  The Sixth

Circuit has also held that an inmate's right to be free from prison violence is clearly established.

*Bishop*, 636 F.3d at 766.  But, as the Sixth Circuit recently clarified in *Beck*, the inquiry does not

end there: "[T]he general right to be free from inmate violence will often not clearly establish

whether an official reasonably responded to the risk of violence on a given occasion." *Beck*, 969

F.3d at 602–03. Rather, "precedent 'must point [unmistakably] to the unconstitutionality of the

conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the

mind of a reasonable officer that his conduct was unconstitutional.'" *Id.* at 603 (quoting *Perez v.

Oakland County*, 466 F.3d 416, 427 (6th Cir. 2006)).

## III.   Discussion

The Amended Complaint lays out three separate Eighth Amendment "counts": Count one

asserts that all Defendants were deliberately indifferent by failing to protect them from prison

violence. [R. 10 ¶¶ 42–45]  Count three claims that Defendants Tilley and Erwin are liable in

their supervisory roles. [*Id.* ¶¶ 52–55]

It is unclear what claim Plaintiffs assert in count two. [*Id.* ¶¶ 46–51]  In their Amended

Complaint, Plaintiffs state that this count is "based on a nonfrivolous argument for extending,

modifying, or revising existing law, or establishing new law." [*Id.* p. 8 n.2]  Plaintiffs do not

mention this count once in their Response.  As best the Court can tell, Plaintiffs appear to be

asserting that they need only satisfy an objective standard for a failure-to-protect claim.  The

Supreme Court has made clear that deliberate indifference requires an objective and subjective

showing. *Farmer*, 511 U.S. at 847.  As analyzed by Judge Reeves when presented with the same

argument, Plaintiffs have "not alleged facts or law that would support [this] claim." *Cordle v.*

*Clark*, No. 6: 17-23-DCR, 2018 WL 988075, at *3 (E.D. Ky. Feb. 20, 2018).  Therefore, this

"count" will be dismissed.  The claims for the remaining counts will be discussed below.

### A.     Plaintiff Andrew's § 1983 Claims

#### i.      Exhaustion

KSR has an internal inmate grievance procedure ("Grievance Procedure," "Grievance

Policy," or the "Policy"). [R. 13-2]  As the Court previously summarized:

> [The policy] defines a "grievable issue" as "any aspect of an inmate's life in
> prison that is not specifically identified as a non-grievable issue," and it
> specifically includes "[c]orrections policies and procedures," "[i]nstitutional
> policies and procedures," and "[p]ersonal action by staff." (*Id.* ¶ II.B.) It also
> includes a list of eleven non-grievable issues. (*Id.* ¶ II.C.) If an inmate wishes to
> file a grievance, he must do so in writing and include "all aspects of the issue and
> identify all individuals" so that the grievance may be adequately addressed by the
> prison. (*Id.* ¶ II.J.1.a.5.) A grievance may either be rejected or permitted to move
> on to the informal resolution stage. (*Id.* ¶ II.J.1.) While there is a multistep
> appeals process for grievances that move on to the informal resolution stage, there
> is no appeals process for grievances that are rejected. (*Id.*) Specifically, there is no
> procedure that allows for an appeal of a grievance that is rejected as "non-
> grievable."

[R. 20 p. 5]  The Court previously held that Andrew had not exhausted his administrative

remedies for his failure-to-protect claim because his grievance did not identify all individuals

against whom he sought relief. [R. 20 pp. 8–9; R. 27 p. 3]  However, it granted reconsideration

on the issues of whether the grievance process was available with respect to Defendants Tilley

and Erwin, for two reasons. [R. 27 p. 8]  First, because Tilley and Erwin were outside of KSR, an

issue of fact remained about whether the grievance process applied to them. [*Id.* pp. 4–6]

Second, because Plaintiffs' grievances were deemed non-grievable and therefore not heard, an

issue of fact remained about whether the grievance process was available to Plaintiffs generally.

[*Id.* pp. 6–8]  Teresa Turner, a KSR grievance coordinator at the time, stated that inmates could

file grievances if a staff member failed to protect them, and that she would process grievances

that complained about a lack of staffing. [R. 81-6 pp. 14–15, 23–25, 38–39, 46–49]

Since Defendants have shown that a generally available remedy existed for claims related

to staffing issues and against staff who failed to protect inmates, the burden shifts to the

Plaintiffs to show that the generally available administrative remedies were effectively

unavailable to them. *See Bennett*, 2017 WL 3208591, at *5 (citing *Albino*, 747 F.3d at 1172).  In

their Response, Plaintiffs do not meaningfully argue that remedies were "generally unavailable"

to Andrew. *See* [R. 81 pp. 12–16 ("*Morgan* was not required to exhaust administrative remedies

because the grievance system was not available *to him*.") (emphasis added)]  Instead Plaintiffs

argue that the grievance system was not generally available to Morgan, and that for both

Plaintiffs it was unavailable for Defendants Tilley and Erwin because they are officials outside

KSR. [*See* R. 81 pp. 12–16 (generally unavailable for Morgan); *id.* pp. 16–18 (unavailable for

both Plaintiffs for Tilley and Erwin)]  This lack of argument alone is grounds for granting

Defendants' arguments with respect to this issue. *See Hill v. Jones*, No. 5:18-CV-511, 2019 WL

4455982, at *3 (E.D. Ky. Sept. 17, 2019) ("The Sixth Circuit has [] held that when a party fails

to respond to a motion or argument therein, the lack of response is grounds for the district court

to assume opposition to the motion is waived, and grant the motion.").

Even on the merits, Andrew has not shown that administrative remedies for his failure-to-

protect claim against Defendants Smith, Acosta, and Jones were unavailable to him.  His

grievance described his assault, and he asked for camera footage to be reviewed and appropriate action to be taken because only one of the three attackers had been taken to segregation. [R. 15-1]  The grievance was rejected because it clearly seeks disciplinary action against other inmates, a non-grievable issue. [R. 81-6 pp. 30–37]  It mentions nothing about staffing issues or complaints against individual staff members for failing to protect him.  The fact that Andrew's grievance—which sought disciplinary action taken against other inmates—was rejected as non-grievable does not show that administrative remedies relating to staffing issues or against officers who failed to protect him were generally unavailable to him.  Accordingly, Andrew has not shown that the grievance process was "generally unavailable" to him with respect to Defendants Smith, Acosta, and Jones. *See Bennett*, 2017 WL 3208591, at *5.

However, there are still genuine issues of material fact with respect to whether the Grievance Policy provided administrative remedies against Defendants Tilley and Erwin, high-ranking state officials located outside the prison.  The Grievance Policy is silent on whether it allows or prohibits grievances against officials outside of the prison. [R. 13-2]  The Grievance Policy does provide that a "[n]on-departmental complaint; for example, Social Security benefits and federal detainers" are not grievable. [*Id.*]  It also provides a non-exhaustive list of example grievable issues relating to an inmate's life in prison, including "corrections policies and procedures, institutional policies and procedures, personal action by staff," and "staff conflict." [*Id.* p. 2]  Former KSR grievance coordinator Turner testified that she thought that the Grievance Policy would cover claims against them but conceded that she did not consider Secretary Tilley or Commissioner Erwin "staff." [R. 81-6 pp. 18–19, 39]  She also testified that she never once saw a grievance filed against Secretary Tilley. [*Id.* p. 28]  Casey Dowden, another former grievance coordinator, testified that the Policy does not say against whom an inmate could file a

grievance. [R. 81-21 p. 14]  She stated that she would not have accepted a grievance against another inmate, for example, but that the Policy did not say inmates could not file grievances against the Commissioner or Secretary. [*Id.* pp. 14–15]  Nevertheless, when served with a request for production for "all grievances filed at KSR between January 1, 2016 and January 1, 2017 that request that James Erwin or John Tilley take some action," Defendants provided no such grievances. [R. 81-25; R. 81-24]

At this point, Defendants have not satisfied their burden of proving that the Grievance Policy provided an "available" remedy for high-ranking officials outside KSR like Defendants Tilley and Erwin.  The Policy is clearly silent on the issue.  While Turner testified that she thought that the Policy probably covered officials outside KSR, she did not state whether she had actually processed, or even seen, such a grievance.  Dowden simply said that the Policy did not explicitly disallow such grievances, not that she processed them.  Moreover, Defendants were unable to produce a single example of any grievances against outside officials, let alone ones that were processed.

As Defendants have not shown that administrative remedies were actually available against Defendants Tilley and Erwin, Plaintiffs need not exhaust their claims with respect to those Defendants. *Ross*, 136 S. Ct. at 1862.  However, Defendants have shown that the Grievance Policy was generally available for claims against Defendants Smith, Acosta, and Jones, and Plaintiff Andrew has not shown that those remedies were unavailable to him. Therefore, Andrew's § 1983 claims against Smith, Acosta, and Jones will be dismissed without prejudice for failure to exhaust administrative remedies.

**ii.    Merits**

While Andrew need not exhaust administrative remedies for claims against Tilley and Erwin, his claims fail on the merits. His deliberate indifference claims fail because there are no facts in the record showing that either Defendant subjectively ignored a risk to his safety. *See Bishop*, 636 F.3d at 766–67. The subjective prong requires that each Defendant "be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and [] must also draw the inference." *Id.* Andrew must also prove that each officer "had enough personal contact with him to be subjectively aware of his vulnerability," *id.* at 768, or that each officer "had knowledge about the substantial risk of serious harm to a particular class of persons" to which Andrew belonged, *Taylor*, 69 F.3d at 81. Andrew's supervisory liability claims fail because there is no evidence that Tilley actively encouraged any unconstitutional behavior, and because there is no evidence that Erwin's active performance of his job directly resulted in Andrew's injury.

### a. Tilley

Simply put, there is no evidence in the record to establish that Secretary Tilley was even aware Andrew existed, let alone that he knew of a specific danger to him *and* then ignored that danger. There are no facts in the record indicating Tilley had any personal contact with Andrew that could have made him subjectively aware of his vulnerability. *See Bishop*, 636 F.3d at 766–68. Further, there are no facts indicating that Tilley knew of any substantial risk of serious harm to any class of persons to which Andrew belonged. *See Taylor*, 69 F.3d at 81. Andrew claimed to be vulnerable because of his age and his health, but nothing in the record indicates

that Tilley knew about that alleged vulnerability. [*See* R. 81-11 pp. 1–3]  Therefore, Andrew's deliberate indifference claim against Tilley must fail.

Likewise, Andrew's supervisory liability claim against Tilley fails.  There is no evidence that shows that Tilley encouraged any unconstitutional behavior of any subordinates. *See Peatross*, 818 F.3d at 241 ("[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.").  Neither is there evidence that Tilley "abandon[ed] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler*, 893 F.3d at 898.  Accordingly, Tilley is entitled to qualified immunity.  Summary judgment with respect to Andrew's claims against Tilley is granted.

### b.      Erwin

There is no evidence that Erwin subjectively disregarded a risk to Andrew or ignored a risk to a particular class of persons to which Andrew belonged.  Andrew never wrote to Erwin or communicated with him at any point.  In fact, the only person with whom Andrew discussed his safety was Deputy Warden James Coyne. [R. 81-11 p. 2]  Morgan did communicate with Erwin, but those communications only indirectly concerned Andrew.  Morgan's first letter states that inmates are beating on younger, weaker inmates and preying on sex offenders. [R. 81-8 p. 1]  There is no evidence that Andrew is a sex offender, and Plaintiffs do not claim that he is.  In his second letter, Morgan mentioned that older inmates were being attacked (Andrew was 49 years old at the time of the attack), but that letter was sent after Andrew was attacked. [R. 72-5 p. 4; R. 81-15]  Plaintiffs also argue that upon learning that the delay in reorganizing KSR was leading to an increase in violence, Erwin should have transferred Andrew. [R. 81 pp. 23–34]  However, this

asks too much as there is no evidence to suggest Erwin even knew who Andrew was, or knew that he belonged to a particular class of persons that exposed him to a substantial risk of serious harm. *See Bishop*, 636 F.3d at 766–68; *Taylor*, 69 F.3d at 81.  Even if Erwin knew that KSR "housed many violent prisoners and that prison violence did occur," that does not rise to the level of deliberate indifference. *Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir. 1992).

Andrew's supervisory liability claim against Erwin fails because there is no evidence that Erwin's active performance of his individual job function directly resulted in Andrew's injury. *See Gregory*, 444 F.3d at 752 (citing *Taylor*, 69 F.3d at 81).  Moreover, supervisory liability requires active behavior on behalf of the supervisor. *Peatross*, 818 F.3d at 241.  Plaintiffs present no evidence that Erwin, in the active performance of his individual job functions, caused Andrew to suffer a constitutional injury. *Gregory*, 444 F.3d at 752.  Plaintiffs complain that Erwin did not sufficiently investigate Morgan's first letter, but it is unclear how any supposed failure to do so directly resulted in Andrew's attack.  Morgan's first letter mentioned vulnerable classes of prisoners to which there is no indication that Andrew belongs. [R. 81-8]  Given that there are no genuine issues of material fact with respect to Andrew's claims against Erwin, he is entitled to qualified immunity and summary judgment is granted with respect to those claims.

### B.      Plaintiff Morgan's § 1983 Claims

#### i.      Exhaustion

Defendants argue that Morgan's claims (except for his claims against Jones) should be dismissed for failing to exhaust his administrative remedies, even though he filed a grievance and the grievance was incorrectly deemed "non-grievable."  Morgan claims that because his grievance was incorrectly rejected, the process was unavailable to him pursuant to *Ross*, 136 S.

Ct. at 1862.  Defendants argue that Morgan's argument fails because he cannot show that the grievance process was "repeatedly" unavailable. [R. 74 p. 13]

Defendants' argument misses the point.  "[I]mproper screening of an inmate's administrative grievances renders administrative remedies 'effectively unavailable' such that exhaustion is not required under the PLRA." *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010); *Hill v. Snyder*, 817 F.3d 1037, 1040 (7th Cir. 2016) (holding that when a prison refuses to process a grievance in a way that violates their own grievance policy rules, no further administrative remedies are available); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well-known proverb states, they cannot have their cake and eat it too.").  Defendants admit the rejection was incorrect under the Grievance Policy [R. 72-1 p. 14], and Morgan could not appeal this determination. [R. 81-21 p. 23] Claiming that Morgan had available remedies to exhaust when his grievance was incorrectly rejected strains credulity.  In this case, Morgan has shown that the grievance process was effectively unavailable to him. *See Sapp*, 623 F.3d at 823; *Hill*, 817 F.3d at 1040; *Bennett*, 2017 WL 3208591, at *5.  Therefore, he need not exhaust his administrative remedies for his claims.[2]

### ii.    Merits

#### a.    Tilley

Morgan's claims against Tilley fail for the same reason as Andrew's.  There is absolutely no evidence in the record to establish that Secretary Tilley subjectively ignored a substantial risk to Morgan, had sufficient (or any) knowledge of or contact with him, or was aware of any risk to

---

[2] Like Plaintiff Andrew, the grievance process was also unavailable to Morgan for claims against Defendants Tilley and Erwin.

a class of persons to which Morgan belonged. *See Bishop*, 636 F.3d at 766–67; *Taylor*, 69 F.3d at

81.  There is also no evidence that Tilley actively encouraged any unconstitutional behavior or

abdicated the specific duties of his position. *See Peatross*, 818 F.3d at 241; *Winkler*, 893 F.3d at

898.  In fact, Plaintiffs do not cite anything in the record to suggest that Tilley had any

knowledge required to state an Eighth Amendment claim, regardless of the theory.  Accordingly,

Tilley is entitled to qualified immunity and summary judgment is granted for Morgan's claims

against Tilley.

### b.      Smith

Similarly, there is no evidence to support Morgan's supervisory liability claim against

Smith.  Plaintiffs do not contest this in their Response. *See Hill*, 2019 WL 4455982, at *3 ("The

Sixth Circuit has [] held that when a party fails to respond to a motion or argument therein, the

lack of response is grounds for the district court to assume opposition to the motion is waived,

and grant the motion.").  Plaintiffs have not shown that Smith was aware of and encouraged,

adopted, or knowingly acquiesced to any unconstitutional violations committed by his

subordinates, *see Peatross*, 818 F.3d at 242, or that he abdicated the specific duties of his

position, *Winkler*, 893 F.3d at 898.  Accordingly, Smith is entitled to qualified immunity on this

count and summary judgment is granted.

### c.      All Other Defendants

The Sixth Circuit recently clarified its qualified-immunity standard.  Per *Beck*, that

standard requires a plaintiff seeking to defeat qualified immunity to "identify with 'a high degree

of specificity' the legal rule that a government official allegedly violated." 969 F.3d at 599

(quoting *Wesby*, 138 S. Ct. at 590).  Though the Sixth Circuit had previously adopted this

standard to adjudicate qualified immunity, *see supra* Section II.E., no party addressed or applied

the standard under the specific facts of this case.  Accordingly, the Court directs the parties to re-brief Plaintiff Morgan's remaining claims under the *Beck* standard.  In doing so, it is not sufficient to simply refer to the general rights at issue here.  "The rule 'must be particularized to the facts of the case.'" *Beck*, 969 F.3d at 599 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)).  Specifically, the parties must address the standard articulated in *Beck*, with discussion of analogous case law, such that "precedent 'must point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional.'" *Id.* at 603 (quoting *Perez*, 466 F.3d at 427).  The parties must address whether this standard has been met under the specific facts of this case.

Accordingly, the Court will deny without prejudice Defendants' Motions for Summary Judgment with respect to Morgan's claims against all other defendants, with leave to refile within 45 days of the entry of this Order.  Normal response and reply deadlines shall apply.

Defendants Smith, Tilley, Jones, and Acosta's Motion for Summary Judgment will be denied without prejudice with respect to Morgan's deliberate indifference claims against Defendants Smith, Jones, and Acosta, with leave to refile within 45 days of the entry of this Order.  Defendant Erwin's Motion for Summary Judgment will also be denied without prejudice with respect to Morgan's supervisory liability and deliberate indifference claims against him, with leave to refile within 45 days.

### C.      Plaintiffs' State Law Negligence Claim

Plaintiffs also assert a state law negligence claim against all Defendants. [R. 10 ¶¶ 56–60]  The Court previously dismissed this claim with respect to all Defendants except Officer Jones. [R. 27 p. 11]  Defendants fail to address this claim in their Memorandum in Support of their

Motion for Summary Judgment. [R. 72-1]  The Court directs Defendant Jones to address on re-briefing whether this claim is opposed, and if so, on what grounds.

IV.    **Conclusion**

Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendants Tilley, Smith, Acosta, and Jones's Motion for Summary Judgment **[R. 72]** is **GRANTED in part**.

    a.   Plaintiffs' § 1983 claims in Count 2 are **DISMISSED with prejudice**.

    b.   Plaintiffs' remaining § 1983 claims (Counts 1 and 3) against Defendant Tilley are **DISMISSED with prejudice**.

    c.   Andrew's remaining § 1983 claims (Counts 1 and 3) against Defendants Smith, Acosta, and Jones are **DISMISSED without prejudice** for failing to exhaust administrative remedies.

    d.   Morgan's § 1983 claim for supervisory liability (Count 3) against Defendant Smith is **DISMISSED with prejudice**.

2. Defendants' Tilley, Smith, Acosta, and Jones's Motion for Summary Judgment **[R. 72]** is **DENIED without prejudice** with respect to Morgan's § 1983 deliberate indifference claims (Count 1) against Defendant Smith, Acosta, and Jones.

3. Defendant James Erwin's Motion for Summary Judgment **[R. 74]** is **GRANTED in part** and **DENIED in part**.

    a.   Plaintiffs' § 1983 claims in Count 2 are **DISMISSED with prejudice**.

    b.   Erwin's Motion for Summary Judgment [**R. 74**] is **GRANTED** as to Andrew's remaining § 1983 claims against him (Counts 1 and 3), and those claims are **DISMISSED with prejudice**.

    c.   Erwin's Motion for Summary Judgment [**R. 74**] is **DENIED without prejudice** with respect to Morgan's remaining § 1983 claims against him (Counts 1 and 3).

4.   Defendants **SHALL** refile any motions for summary judgment within **forty-five (45) days** of the entry of this Order.  Normal response and reply deadlines will apply.  All briefing must include the qualified-immunity standard discussed in *Beck v. Hamblen County*, 969 F.3d 592 (6th Cir. 2020).  Further, Defendants must address whether the state-law negligence claim against Defendant Jones is opposed.

This the 24th day of November, 2020.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY